IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BRIANA RIVERA,

                 OPINION AND ORDER

      Plaintiff,

                  16-cv-673-bbc

    v.

CITY OF MADISON, OFFICER GABRIEL HECK
and OFFICER DAVID WHITE,

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

    In this civil action for monetary relief under 42 U.S.C. § 1983, plaintiff Briana Rivera brings false arrest and excessive force claims under the Fourth Amendment and state law assault and battery claims against defendants Officers Gabriel Heck and David White, stemming from her arrest on January 25, 2014. She also brings municipal liability claims against the City of Madison for inadequate training, supervision and discipline. Both sides have moved for summary judgment. Dkt. ##17, 28. For the reasons stated below, I am denying plaintiff's motion for summary judgment on her false arrest claim because a reasonable officer in the position of defendants Heck and White could have concluded that plaintiff was reasonably subject to arrest for disorderly conduct. I am denying her motion for summary judgment on her warrantless arrest claim because there are still genuine disputes about the legality of the officers' entry into her home. I am granting defendants' motion with respect to plaintiff's false arrest claim and her claims against the City of Madison, which are based upon the allegedly unconstitutional acts of defendants Heck and White, but am

1

denying the motion with respect to plaintiff's claims of excessive force, warrantless entry and state law assault and battery claims.

From the parties' proposed findings of fact and evidence in the record, I find the following facts to be material and undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Briana Rivera is a biracial African American. At the time of the relevant incident, she was 22 years old and worked as a certified nursing assistant. She lived in an apartment on Dawn Road in Madison, Wisconsin, with her then-fiancé (now husband) Vickson Magada, their two-year old daughter, N.M., and plaintiff's two young sisters. Defendants David White and Gabriel Heck were police officers for the City of Madison Police Department who attended the department's police academy and received ongoing on-the-job police training on arrest tactics, use of force and domestic violence incidents. At the time of the incident, plaintiff was five feet five inches tall and weighed approximately 140 pounds; Officer White was six feet two inches tall and weighed around 230 pounds; and Officer Heck was six feet tall and weighed around 170 pounds.

### B. Background Events of January 24 and 25, 2014

At approximately 10:00 p.m. on January 24, 2014, plaintiff drove Magada and N.M. to visit Magada's friend, Modou Sonko, at Sonko's residence on Melody Lane. She expected

that Magada and N.M. would want to be picked up in about 30 to 60 minutes. However, Magada never called plaintiff about coming to get them. Starting around 11:00 p.m., plaintiff attempted to call Magada about picking him up. Between midnight and 2 a.m., plaintiff called about a dozen times, but Magada never answered. Instead, N.M., the two-year-old, kept answering the phone and hanging it up. Plaintiff was upset because her daughter was awake so late and because she believed that Magada and Sonko were encouraging N.M. to hang up the phone on her. Plaintiff and one of her young sisters finally went over to Sonko's apartment around 2:00 a.m.

When plaintiff and her sister arrived at the apartment, they were buzzed in and went inside Sonko's apartment on the third floor. Plaintiff picked up N.M., told Magada he was an "ass" and could stay at Sonko's for the night and attempted to leave with N.M. and her sister. Magada grabbed plaintiff violently and struggled with her while she held N.M. Sonko got between plaintiff and Magada and then plaintiff ran down to the second floor of the apartment building. Magada caught up with plaintiff on the second floor, pinned her to the wall, raised his arm and drew his fist back as if to strike her while she continued to hold N.M. At that moment, Marguerite Tate, who resided in a second floor apartment, opened her door and told Magada that he better not hit plaintiff and that she was calling the police. Magada then released plaintiff and she ran downstairs to the parking lot with N.M. and her sister. Magada followed and they all left together.

Tate called 911 and reported seeing a man "looking like he was going to beat up his wife," who "had babies in her hand." Dkt. #40-1 (transcript of 911 call). She further stated

that the people had come from upstairs, the man was "yelling" and "pushed [the women] up against the wall," while "she had a baby in her arms," and that the woman was scared. Tate said that the people had gotten into a silver van and left the parking lot. Id.

## C. Defendant White's Investigation at Melody Lane

At approximately 2:53 a.m., defendant White was dispatched to Melody Lane as the result of Tate's 911 call. (According to the dispatch notes sent to White's computer, the caller was upset because a male pushed a female with children. White does not recall whether he reviewed the dispatch notes. He recalls only that dispatch told him that the caller had observed a physical disturbance between a man and woman in the hallway of her building.)

Defendant White went to Tate's apartment first. White does not recall everything Tate told him during their conversation. He remembers that she told him she had seen a disturbance where she thought she saw a black male push a black female and that the female had a child. White also remembers that Tate told him she yelled at the couple that she was calling the police, after which the people got in a van and left. (White dep., dkt. #34, at 79-80, 84, 224). According to Tate's affidavit, Tate told White that she had heard running on the steps of the stairwell located next to her apartment. When she opened the door, she saw a man and a woman in an argument and saw the man push the woman up against the wall and raise his hand as if he were going to hit her. Tate told White that the woman had a baby or young child in her arms and another child standing next to her. She also told White that the woman and children were quiet and were not crying, but looked scared of the man. Tate

told White that she yelled at the man and woman that she was going to call the police, at which point they left the building, got into a silver van and drove away. (Tate Aff., dkt. #55.)

After speaking with Tate, defendant White went upstairs, where he made contact with Sonko, who told White that he had had some friends over that night and that these friends had caused the disturbance. Sonko told White that plaintiff had dropped Magada and their two-year-old daughter, N.M., off at Sonko's house earlier that night. While Magada and N.M. were at his apartment, plaintiff started calling Magada's phone and did so several times. Sonko told Officer White that, each time, N.M. would answer the phone, say hello and then hang up the phone. Sonko also told White that, at approximately 2:45 a.m., plaintiff arrived at Sonko's apartment very upset and yelling at both Magada and N.M. Sonko also told White that plaintiff slapped N.M. (The parties dispute exactly what Sonko told White regarding plaintiff's slapping N.M. Neither side submitted a statement from Sonko regarding what exactly he said to White. White states in his declaration that Sonko told him that plaintiff was "physically striking" N.M. "all over her upper body," although White testified at trial that Sonko had told him that plaintiff was "slapping" N.M. Plaintiff objects to White's declaration on hearsay grounds as to his description of what Sonko told him, but his statement is not hearsay because it is not being offered for the truth of Sonko's statements. On the other hand, defendant's attempt to rely on Sonko's trial testimony about what Sonko told White is barred by hearsay rules, because defendants seek to introduce Sonko's trial testimony for the truth of the matter asserted, namely, that he told White something in

particular.)

Sonko also told defendant White that plaintiff had thrown a pair of tennis shoes at Magada. Sonko told White that, after throwing the shoes, plaintiff continued to yell at Magada and N.M. and that plaintiff and Magada were pushing each other. Finally, Sonko told White he was concerned for the safety of Magada and N.M. because he knew from past experiences that plaintiff had a problem controlling her anger. (Plaintiff and Magada dispute much of Sonko's account of what happened at his apartment, denying that plaintiff yelled, threw shoes or hit N.M. Plaintiff further argues that Sonko's account of her hitting N.M. contradicts Tate's account that N.M. was not crying. Regardless whether Sonko's account was accurate, plaintiff has no personal knowledge of what Sonko told White.)

### D. Events at Plaintiff's Apartment

Defendant White believed he should investigate the situation further to make sure that plaintiff, Magada and N.M. were safe. From telephone information provided by Sonko, defendant White located plaintiff's and Magada's residence, at 2810 Dawn Road, Apartment B, in Madison.

Defendant White knocked on plaintiff's door, stated that he was there because of the incident on Melody Lane and asked to come inside. Plaintiff's apartment is a second level apartment. The front door opens to a small entryway, measuring between 4 and 5 feet square. Opposite the front door is a stairwell with approximately 20 to 25 steps that leads upstairs to a combination living room, kitchen and dining area. Plaintiff told White that he

could not come upstairs, but could come into the downstairs entryway. Plaintiff told White that the children were upstairs. (The parties dispute whether plaintiff told White he could not go upstairs with his shoes on, suggesting that he would be able to go upstairs if he took his shoes off. White says plaintiff told him he could go upstairs with shoes on, while plaintiff says that although she may have mentioned that the family did not go upstairs with shoes on, she made it clear that she did not want White upstairs, with or without shoes.)

Defendant White agreed to stay downstairs and sent Magada upstairs so he could speak to plaintiff alone. White stated that his partner was coming and would take Magada outside to talk. White then asked plaintiff what had happened on Melody Lane and plaintiff told him that she went to pick up her daughter and "some words were exchanged" between her and Magada. Plaintiff told White that things had been resolved and there would be no more problems that evening. White noticed that plaintiff had a cut on her chin. (It appears that plaintiff had injured her chin a couple of days earlier.) White did not ask plaintiff about her chin or inspect it at the time. He also did not tell plaintiff anything about Sonko's allegations that she had harmed N.M. or ask whether N.M. was all right.

Shortly after defendant White began talking with plaintiff, Officer Heck arrived at plaintiff's apartment. Heck had been dispatched to assist White with the investigation and to provide backup. Heck had not communicated with anyone at the Melody Lane apartments regarding the incident. White let Heck into the entryway of the apartment and told Heck to interview Magada, who was still upstairs. (The parties dispute what happened next. Plaintiff says that White told Magada to get his coat and Heck responded that he

7

would just interview Magada upstairs. White then told Heck that plaintiff did not want anyone upstairs, especially with shoes on, so Heck slipped his shoes off and jogged up the stairs. According to defendants, plaintiff stated that she did not want Magada to go outside, but she had indicated the officers could go upstairs if they took their shoes off.) It is undisputed that as soon as Heck went upstairs, plaintiff immediately told White and Heck that she did not want anyone upstairs and she had not consented to their being in her house. She yelled up the stairs to Magada that Heck needed to come down to talk to Magada outside. Upstairs, Magada asked Heck repeatedly whether they could go outside. Heck refused, telling Magada they could talk inside. (Defendants say that Magada ultimately said it was "fine" if they talked upstairs, but Magada denies saying this.)

After defendant Heck went upstairs, defendant White continued trying to interview plaintiff but could not because plaintiff was yelling that Heck and Magada needed to come back downstairs and that she did not want Heck walking around up there. (Defendants say that plaintiff was shouting "at the top of her lungs" in a "very aggravated manner," while plaintiff says she was using a "raised voice" just loud enough to be heard upstairs. Defendants also say that White attempted to explain to plaintiff that he and Heck were in the apartment legally and would not leave until their investigation was complete, that she could not control whether Magada spoke with Heck and that Heck would not walk around the apartment unless Magada was with him or gave him permission. Plaintiff denies that White said this.)

At the time she was yelling up the stairs, plaintiff was standing toward the bottom of the staircase facing defendant White. At some point, she took a few steps up the stairs away

from White. The parties dispute what happened next.

Defendant White says that when plaintiff started going up the stairs away from him, he immediately grabbed her arm to stop her and told her she could not go upstairs and cause a disturbance. White then stepped past her to block her from going up the stairs. White says that plaintiff continued yelling up the stairs for Magada to come downstairs, continued arguing about the legality of the officers presence in the house and repeatedly pushed White in his torso area in an effort to get past him up the stairs. White says he told plaintiff at least five times to stop pushing him and told her that she would be arrested if she did not stop and calm down. White says that plaintiff did not heed these warnings and continued to try to push past him to get up the stairs. White then told plaintiff she was under arrest. Plaintiff tried to pull away from White and run down the steps, but White held on to plaintiff's arm and followed her down the steps. White says that he told plaintiff to put her arms behind her back while he continued to hold her left arm, but plaintiff attempted to pull her left arm away from him with her right arm flailing.

Defendant Heck says that he began running down the stairs when he saw plaintiff attempting to get past White. He grabbed plaintiff's right arm and pushed her up against the wall. Defendants state that while they held plaintiff's arms and pinned her against the wall, she tried to pull her arms away and to thrust her head backwards towards the officers. Heck says he was concerned that plaintiff could injure him or White by causing them to lose their balance and fall down the stairs, so he pushed plaintiff's head forward toward the wall while White secured the handcuffs. As he did this, Heck's hand became tangled in plaintiff's hair,

causing him to pull her hair while he held her against the wall.

Plaintiff's version of events is different. Plaintiff says that after she took several steps up the stairs, White told her to stop and she did. Defendant Heck then ran down the stairs to her, grabbed her, put her in handcuffs, slammed her head against the wall and pulled her hair multiple times. Plaintiff says that White stood at the threshold watching and never came on the stairs or touched her. Plaintiff says that neither defendant told her to put her hands behind her back, though both defendants yelled that she needed to listen and "stop resisting." Plaintiff responded that she was not resisting. As a result of Heck's actions, plaintiff had bruises on her forehead and right forearm and her leg hurt for several days.

After plaintiff was handcuffed, she was placed in the back seat of defendant White's police squad car. White then returned to the apartment, spoke with Magada and checked N.M., who had no injuries. Plaintiff was then transported to the Dane County jail, booked for the crime of resisting/obstructing under Wis. Stat. § 946.41(1), and processed by jail personnel. Magada followed the officers to the jail. As soon as plaintiff completed her jail booking and was released into the general jail population, Magada posted bail for plaintiff and she was released from jail into his custody.

### E. Subsequent Criminal Prosecution of Plaintiff

Although defendant White arrested plaintiff on January 25, 2014 for resisting/obstructing under Wis. Stat. § 946.41(1), the Dane County District Attorney's office prosecuted plaintiff for disorderly conduct under Wis. Stat. § 947.01(1), a Class B

misdemeanor under Wis. Stat. § 939.51(3)(b), based solely on allegations related to plaintiff's conduct at Sonko's apartment on Melody Lane and not on any of the alleged conduct which took place later at plaintiff's apartment. A jury trial was held on July 24, 2014, at which Sonko was the sole witness for the prosecution. After Sonko's testimony, plaintiff's counsel moved for a directed verdict, which the judge denied. Plaintiff, Magada, Tate, White and plaintiff's sister then testified. The jury acquitted plaintiff.

## F. Plaintiff's Post-Incident Complaint

On January 27, 2014, three days after the incident, plaintiff submitted a Citizen Complaint of Employee Conduct against defendant Heck to the Madison Police Department's Professional Standards and Internal Affairs Division, alleging excessive use of force. Sergeant Alexander Berkovitz conducted an investigation of plaintiff's complaint. The Madison Police Department does not always notify officers of citizen complaints, but did so in this case. Berkovitz reviewed plaintiff's written complaint and photographs of her injuries that had been taken by plaintiff and department personnel that showed redness and bruising on her forehead and arm. Berkovitz also interviewed plaintiff, Magada, White and Heck, and reviewed Heck's and White's police reports. Berkovitz asked a member of the department's personnel and training team to review Heck's and White's conduct; that officer concluded that the use of force was reasonable and consistent with training. Berkovitz did not review transcripts from plaintiff's criminal trial or listen to the 911 tape from the incident.

Berkovitz concluded that Heck did not use excessive force against plaintiff and

recommended that Heck be exonerated with respect to the allegations of plaintiff's complaint. Ultimately, this was done.

OPINION

Plaintiff is asserting the following claims: (1) she was the subject of a false arrest because defendants had no probable cause to arrest her; (2) even if defendants had probable cause, her arrest was unlawful because defendants arrested her in her house without a warrant, consent or exigent circumstances; (3) defendants used excessive force while arresting her; (4) defendants committed assault and battery in violation of state law; and (5) the City of Madison failed to properly train, supervise and discipline defendants. I address each claim below.

A. False Arrest

Both parties have moved for summary judgment on plaintiff's false arrest claim. To prevail on a false arrest claim, plaintiff bears the burden of establishing that the officers arrested her without probable cause. Mucha v. Village of Oak Brook, 650 F.3d 1053, 1056 (7th Cir. 2011). "An officer has probable cause to make an arrest only when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." Gibbs v. Lomas, 755 F.3d 529, 537 (7th Cir. 2014) (citation omitted). "In making this assessment, the question is whether, given the 'totality of the circumstances,' a reasonable

officer would believe that the suspect had committed a crime." Id. (quoting Jones v. City of Elkhart, Indiana, 737 F.3d 1107, 1114 (7th Cir. 2013)).  The subjective motivations of the officer are irrelevant.  Id.  See also Abbott v. Sangamon County, Illinois, 705 F.3d 706, 714 (7th Cir. 2013) ("Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant.")  Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking.  Devenpeck v. Alford, 543 U. S. 146, 153–55, n.2 (2004).  See also McComas v. Brickley, 673 F.3d 722, 727 (7th Cir. 2012) ("[A]n arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that some criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect.")

1.  Issue preclusion

As a threshold matter, defendants argue that plaintiff's false arrest claim is barred by issue preclusion because the state court determined during her criminal prosecution that defendants had probable cause for her arrest.  In particular, defendants argue that because the state court denied plaintiff's motion for a directed verdict after the prosecution rested its case, the state court necessarily decided that Modou Sonko's testimony gave the officers probable cause to arrest plaintiff.

Although issue preclusion may apply to Fourth Amendment issues resolved in state court, Allen v. McCurry, 449 U.S. 90, 105 (1980), it applies in Wisconsin only if the "same"

issue was actually litigated and decided in a prior action and reduced to judgment. Mrozek v. Intra Financial Corp., 2005 WI 73, ¶ 21, 281 Wis. 2d 448, 467, 699 N.W.2d 54, 63. See also Flooring Brokers, Inc. v. Florstar Sales, Inc., 2010 WI App 40, ¶ 6, 324 Wis. 2d 196, 202, 781 N.W.2d 248, 251 (citation omitted). In this case, defendants have not shown that the state court ever made any determination about probable case or potential Fourth Amendment violations. A review of the transcript from the criminal proceeding shows that plaintiff's counsel argued that the prosecution had failed to show that plaintiff's conduct caused a "threat to the surrounding community," as required to fit the offense of disorderly conduct. Dkt. #39 at 72. The trial judge disagreed, concluding that a reasonable jury could believe Sonko's trial testimony and find that plaintiff's alleged conduct disturbed both Sonko and other residents of his apartment building. Id. at 73. This is not the same question as the one to be answered in this case, which is whether a reasonable officer in White's position would have believed that plaintiff had committed a crime. The Fourth Amendment analysis is based on what White knew after having spoken with both Sonko and Tate on January 25, 2014, not on what a jury heard from Sonko at trial several months later. For this reason, the case is distinguishable from the one on which defendants rely, Jensen v. Foley, 295 F.3d 745, 749 (7th Cir. 2002), in which Fourth Amendment claims were barred by issue preclusion because a state court had previously made a probable cause determination at a hearing. I conclude in this case that issue preclusion does not bar plaintiff's false arrest claim.

2. Probable cause

The question to be determined is whether defendants had probable cause to arrest plaintiff, taking into consideration everything they knew at the time of her arrest. At the time plaintiff was arrested, defendant White had the following information:

(1) Tate's statements regarding what she had witnessed, including having heard someone running down the steps of the stairwell outside her door and, after opening her door, seeing a man pushing a woman with a baby in her arms, with another child standing next to her, the man raising his hand as if he were going to hit the woman and the scared and quiet looks of the woman and children;

(2) Sonko's statements regarding what he had witnessed, including plaintiff's arrival his apartment late at night, her yelling at N.M. and Magada, pushing and throwing shoes at Magada and "slapping" or "physically striking" N.M. "all over her upper body," as well as Sonko's statements that he was concerned for the safety of Magada and N.M. because he knew from past experiences that plaintiff had a problem controlling her anger;

(3) plaintiff's statement to White that "some words had been exchanged" but that things had been resolved; and

(4) the lack of any obvious signs of distress or crying by anyone at plaintiff's apartment.

Defendants argue that these facts gave them probable cause to arrest plaintiff for multiple offenses, including (1) felony physical abuse of a child under Wis. Stat. § 948.03(2)(b); (2) battery under Wis. Stat. § 940.19(1); (3) attempted battery under Wis. Stat. § 939.32(1); and (4) disorderly conduct under Wis. Stat. § 947.01(1). Defendants assert that even if they did not have actual probable cause, they are entitled to qualified immunity. (In a footnote, defendants argue that they also had probable cause to arrest plaintiff for resisting/obstructing an officer under Wis. Stat. § 946.41(1), the crime actually cited during her arrest, but defendants have not developed this argument in any meaningful way.

Therefore, it is deemed waived. <u>Campania Management Co., Inc. v. Rooks, Pitts & Poust</u>, 290 F.3d 843, 852 (7th Cir. 2002) ("Perfunctory and undeveloped arguments are waived.")).

The Supreme Court has cautioned lower courts to "think hard, and then think hard again," before addressing the merits of an underlying constitutional claim when a defendant has raised a qualified immunity defense. <u>District of Columbia v. Wesby</u>, 583 U.S. ___, (Jan. 22, 2018) (slip op., at n.7)(citing <u>Camreta v. Greene</u>, 563 U.S. 692, 707 (2011)). Thus, I will address qualified immunity first.

For false arrest claims, defendants are entitled to qualified immunity if "a reasonable officer could have mistakenly believed that probable cause existed." <u>Fleming v. Livingston County, Illinois</u>, 674 F.3d 874, 878 (7th Cir. 2012) (<u>Humphrey v. Staszak</u>, 148 F.3d 719, 725 (7th Cir.1998) (citations omitted)). Thus, as long as defendants reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest plaintiff, defendants are entitled to qualified immunity. <u>Id.</u> This standard is often dubbed "arguable probable cause." <u>Id.</u> (citations omitted). Arguable probable cause is established "when 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law.'" <u>Id.</u> at 880. Qualified immunity applies so long as there was "arguable probable cause" to arrest for any offense. <u>McComas</u>, 673 F.3d at 727.

To overcome defendants' qualified immunity defense, plaintiff would have to "'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" <u>Wesby</u>, 583 U.S. ___, (Jan. 22, 2018) (slip op. at 15) (citing <u>White v.</u>

Pauly, 137 S. Ct. 548, _, ___ (2017) (per curiam) (slip op., at 6)).  Although it is not necessary to have "'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'"  Id. (citing Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  There may be the "rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," id. (citing Brosseau v. Haugen, 543 U. S. 194, 199 (2004) (per curiam), but "a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." Id. (citation omitted).

Under these principles, I conclude that defendants are entitled to qualified immunity. Even assuming that they lacked actual probable cause, they could have reasonably concluded they had probable cause to arrest plaintiff for disorderly conduct under Wis. Stat. § 947.01(1). "There are two elements to a typical disorderly conduct offense in Wisconsin: (1) 'that the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct' and (2) 'that the defendant's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance.'" Gibbs, 755 F.3d at 538 (citing Wis. Stat. § 947.01(1) and State v. Schwebke, 253 Wis. 2d 1, 644 N.W.2d 666, 674 (2002)). Relying on the statement from Sonko, defendants could conclude reasonably that plaintiff's arrival at Sonko's apartment around 2:00 a.m., yelling, throwing a shoe, slapping her daughter and generally engaging in behavior that disturbed at least one other person in the building, is conduct with a tendency to disrupt public peace or provoke a disturbance.

Plaintiff argues that defendants should not have accepted Sonko's statements as true,

particularly where Tate, the 911 caller, gave statements suggesting that plaintiff was the victim in the situation, not the perpetrator. Plaintiff argues that Tate's statements did not provide probable cause for defendants to arrest her before investigating further, such as by interviewing her and Magada or checking N.M. for injuries. However, the Court of Appeals for the Seventh Circuit has rejected similar arguments, explaining that "police officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness." Burritt v. Ditlefsen, 807 F.3d 239, 250–51 (7th Cir. 2015) (citing Mustafa v. City of Chicago, 442 F.3d 544, 548 (7th Cir. 2006)). See also Abbott, 705 F.3d at 716. Law enforcement is not required to discover more information to undermine probable cause once it has been established. Hodgkins ex rel. Hodgkins v. Peterson, 355 F.3d 1048, 1061 (7th Cir. 2004). The statement of a single witness, such as Sonko in this case, is generally is sufficient to establish probable cause to arrest unless the statement "would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." Beauchamp v. City of Noblesville, Indiana, 320 F.3d 733, 743 (7th Cir. 2003) (citing Woods v. City of Chicago, 234 F.3d 979, 987 (7th Cir. 2001)). See also United States v. McCauley, 659 F.3d 645, 651 (7th Cir. 2011) ("When police officers obtain information from an eyewitness . . . establishing the elements of a crime, the information is almost always sufficient to provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible.")

Further, "in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the

witness or victim is not telling the truth." Beauchamp, 320 F.3d at 743 (citing Spiegel v. Cortese, 196 F.3d 717, 724–25 (7th Cir. 2000). "[T]he law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage," Gerald M. v. Conneely, 858 F.2d 378, 381 (7th Cir. 1988), and no clearly established law "suggests that a [witness's] report must be unfailingly consistent to provide probable cause." Gutierrez v. Kermon, 722 F.3d 1003, 1012 (7th Cir. 2013). See also Gibbs, 755 F.3d at 537 (statement of single witness was sufficient to create probable cause to arrest for disorderly conduct). "Police are entitled to draw on eyewitness descriptions without being required to assume that witnesses got every detail right, or that every omission from a description must establish that the omitted fact did not occur." Bridewell v. Eberle, 730 F.3d 672, 676 (7th Cir. 2013).

In this instance, defendant White was given no information prior to plaintiff's arrest to suggest that Sonko was not giving him credible information. Although Tate's statements suggested that Magada may also have engaged in disorderly conduct or other bad behavior, her statements are not enough to require defendants to discredit Sonko's statements. This is particularly true because "[p]robable cause 'is not a high bar.'" Wesby, 583 U.S. ___, (slip op., at 18) (citing Kaley v. United States, 134 S. Ct. 1580, 103, (2014.)). Probable cause deals with probabilities and depends on the totality of the circumstances," and is "'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules.'" Id. (slip op., at 7) (citing Illinois v. Gates, 462 U. S. 213, 232 (1983)). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. (citation omitted). In light of the totality of the facts and circumstances known to defendants at the

time of plaintiff's arrest, a reasonable officer could have concluded that plaintiff had engaged in disorderly conduct and was subject to arrest. Plaintiff's arguments and evidence fail to raise a genuine issue of material fact as to whether defendants lacked at least arguable probable cause. Therefore, defendants are entitled to summary judgment on plaintiff's false arrest claim.

## B. Unlawful Arrest

Both sides also move for summary judgment on plaintiff's unlawful arrest claim. Plaintiff contends that even if defendants had probable cause to arrest her, they violated her Fourth Amendment rights by arresting her in her home without having a warrant, consent to enter or exigent circumstances. Sparing v. Village of Olympia Fields, 266 F.3d 684, 688 (7th Cir. 2001) ("[P]olice officers may not constitutionally enter a home without a warrant to effectuate an arrest, absent consent or exigent circumstances, even if they have probable cause."). Defendants argue that the arrest was lawful because they had both consent and exigent circumstances to be in plaintiff's home.

### 1. Consent

Defendants contend that their arrest of plaintiff was not unlawful because both plaintiff and Magada gave them consent to be in the apartment. Harney v. City of Chicago, 702 F.3d 916, 925 (7th Cir. 2012) ("Where someone with the authority to do so gives consent to enter . . . the entry is reasonable and not in violation of the Fourth Amendment.") It is undisputed

that plaintiff and Magada consented to defendants' coming into the entryway of their home. However, plaintiff was not arrested in the entryway, but on the stairs, and it is disputed whether defendants had consent from either plaintiff or Magada to be in the apartment beyond the threshold located at the bottom of the stairs. Plaintiff says she told defendants repeatedly that they could not go upstairs, while defendants say plaintiff told them they could go upstairs so long as they removed their shoes.

It is well-established that persons can limit the scope of their consent to allow police into their homes. United States v. Saucedo, 688 F.3d 863, 865 (7th Cir. 2012). The scope of consent is "limited by the breadth of actual consent." United States v. Long, 425 F.3d 482, 486 (7th Cir. 2005). Generally, whether the police acted within the scope of consent is a "question of fact to be determined from the totality of the circumstances." Id. In this instance, where the facts are disputed, I cannot determine whether defendants exceeded the scope of plaintiff's or Magada's consent by proceeding up the stairs to arrest plaintiff.

Defendants suggest that the dispute about consent ultimately does not matter because an arrest inside a home is lawful so long as the initial entry into the home was lawful. However, this argument is not persuasive because, in contrast to the authorities cited by defendants, defendants have not established that their entry onto the stairs was lawful at any point. For example, defendants cite Fitzgerald v. Santoro, 707 F.3d 725, 731 (7th Cir. 2013), in which the court of appeals held that a warrantless entry and arrest were lawful even though the entry had been based on exigent circumstances that may have dissipated by the time of the arrest. In contrast to the present case, the officers in Fitzgerald had established that they had

authority to be in the area of the arrest prior to the arrest.

Defendants also cite Wayne R. LaFave, 3 <u>Search and Seizure: A Treatise on the Fourth Amendment (5th Ed.)</u>, § 6.1(c), "The other-lawful-basis exception," in which Professor LaFave explains that once the police lawfully enter a home, they may arrest without a warrant. However, defendants fail to recognize that in the same section, LaFave explains that "police once inside should be allowed . . . to make an unannounced arrest" so long as "*they do not exceed the spatial boundaries of the consent given*." <u>Id.</u> (emphasis added). He further states that "of course, it is essential that the presence of the police at the very time and *place of arrest be consistent with the entry authority relied upon*." <u>Id.</u> (emphasis added). Because there is a genuine dispute in this case whether defendants exceeded the spatial boundaries of the consent given when they arrested plaintiff, I cannot conclude that defendants are entitled to summary judgment on the issue of consent.

## 2. <u>Exigent circumstances</u>

Defendants also argue that they were lawfully in plaintiff's home under exigent circumstances. Under the exigent circumstances doctrine, the question is "whether it was reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant." <u>Sutterfield v. City of Milwaukee</u>, 751 F.3d 542, 557 (7th Cir. 2014). "Reasonable fear for the safety of a person inside a premises is one such exigent circumstance." <u>Fitzgerald v. Santoro</u>, 707 F.3d 725, 730 (7th Cir. 2013). <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006)

"[O]fficers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.") To determine whether sufficient exigent circumstances exist to justify a warrantless entry, the court must apply an objective standard of reasonableness under the totality of the circumstances. Sutterfield, 751 F.3d at 557.

Defendants argue that exigent circumstances existed for entry because they needed to make sure that all of the occupants were safe, in light of Sonko's and Tate's statements, but this argument is not persuasive. Neither Sonko nor Tate told White that someone had been seriously injured. Although Sonko told White that plaintiff had slapped her child, Sonko did not suggest that the child had been seriously injured or would need medical attention. Tate had seen the child shortly after plaintiff's alleged slapping and she had told White that the child was not crying. Further, when plaintiff and Magada opened the door to their apartment, White could see that both Magada and plaintiff were calm and had no serious injuries. Defendants heard no children crying or anything else suggesting that someone was in distress or needed emergency assistance requiring them to proceed up the stairs into plaintiff's apartment. Defendants state that White saw a cut on plaintiff's chin, which created "exigent circumstances," but defendants do not explain why they would need to enter plaintiff's apartment to inquire about a cut. Indeed, it is undisputed that defendants did not attempt to provide aid or even ask about N.M. or about plaintiff's cut or any other injuries until after plaintiff's arrest.

The cases defendants cite are all distinguishable and involved clearly exigent situations.

For example, defendants cite <u>Anderson v. City of West Bend</u>, 774 F. Supp. 2d 925 (E.D. Wis. 2011), to support their argument that exigent circumstances existed. However, in <u>Anderson</u>, the district court found that exigent circumstances existed where there was a 911 call, neighbors reported hearing calls for help, furniture moving and things banging around, the alleged victim sounded distraught when she first spoke with the officers and the alleged victim had locked herself into the apartment with the alleged assailant. <u>Id.</u> at 939. In contrast, both plaintiff and Magada were calm and willing to talk to defendants in their entryway and exhibited no signs of distress or serious injury. Moreover, defendants had no basis for believing that there had been a physical altercation at plaintiff's apartment, that anyone had been seriously injured or that a physical altercation was likely to resume. Accordingly, defendants have not shown that entry onto plaintiff's stairs was justified by exigent circumstances.

3. Qualified immunity

    Defendants raise a qualified immunity defense to plaintiff's unlawful arrest claim as well. However, qualified immunity does not help defendants because even qualified immunity does not change the rule that facts must be construed in favor of the nonmoving party on a motion for summary judgment. <u>Board v. Farnham</u>, 394 F.3d 469, 476 (7th Cir. 2005). If I construe the facts in plaintiff's favor, then a reasonable jury could find that defendants did not have consent or exigent circumstances that justified entry onto plaintiff's stairwell. At the time, it was clearly established that police officers need a warrant to enter a home unless they

meet one of the exceptions to the warrant requirement identified by the Supreme Court. Stuart, 547 U.S. at 403 (2006) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotations omitted). With respect to exigent circumstances, the Supreme Court has stated that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. Under plaintiff's version of events, no reasonable officer would have concluded that he needed to enter the home to render emergency assistance or protect an occupant from imminent injury. Therefore, defendants are not entitled to qualified immunity.

## C. Excessive Force

Plaintiff argues that defendants violated her rights under the Fourth Amendment because defendant Heck used excessive force against her and defendant White failed to prevent Heck from doing so. An officer violates the Fourth Amendment if he uses force that is unreasonable in light of the "facts and circumstances of the particular case." Kingsley v. Hendrickson,135 S. Ct. 2466, 2473 (2015) (citing Graham v. Connor, 490 U.S. 386, 396, (1989). Factors that may be relevant to this determination include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. Id. When this standard is applied to the present case, it is clear

that summary judgment is not appropriate.

Under plaintiff's version of events, defendant Heck grabbed her arms, slammed her into a wall and pulled her hair repeatedly, both before and after handcuffing her, solely because she was yelling at him to leave her house after he entered the upstairs of her home over her objections. According to plaintiff, she did not attempt to strike, shove, hit or kick the officers, never actively resisted and did not otherwise pose an immediate threat to either officer's safety. If a jury believed plaintiff, it could conclude that defendants' use of force was wholly unnecessary and objectively unreasonable.

Defendants dispute plaintiff's version of events but argue that, even if plaintiff's version is credited, defendants' use of force was reasonable because they could have reasonably believed plaintiff was being "uncooperative" and "suspicious" and that "active physical resistance was imminent." Dfts.' Br., dkt. #27, at 43. This argument is not persuasive. Defendants cite no authority for the proposition that officers may slam someone into a wall and pull her hair because she is being "suspicious," "uncooperative" or may soon engage in some form of "active physical resistance."

For the same reason, defendants' qualified immunity argument fails. When the facts are construed in the light most favorable to plaintiff, a reasonable police officer would have been on notice at the time of the occurrence that plaintiff's conduct did not justify the sort of force described in her account. Kingsley v. Hendrickson, 801 F.3d 828, 832 (7th Cir. 2015) (citing cases in which use of force was unreasonable where confined detainee was not resisting or presenting any threat). See also Cyrus v. Town of Mukwonago, 624 F.3d 856, 863

(7th Cir. 2010) (well established that "[f]orce is reasonable only when exercised in proportion to the threat posed").  Accordingly, neither side is entitled to summary judgment on plaintiff's excessive force claim.

## D.  State Law Claims

Defendants argue that plaintiff's state law assault and battery claims are barred by the Wisconsin discretionary immunity statute, Wis. Stat. § 893.80(4).  That statute bars suit against public employees "for acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions."  Defendants argue that police decisions surrounding the arrest and detention of a suspect, including the use of force, are discretionary acts for which immunity is afforded under Wis. Stat. § 893.80(4).  Sheridan v. City of Janesville, 164 Wis. 2d 420, 427–28, 474 N.W.2d 799, 802 (Ct. App. 1991) (decisions regarding "whether [an arrestee] should be searched, handcuffed, [or] subjected to force during execution of the arrest" are decisions involving the exercise of discretion).  Plaintiff does not deny that defendants' actions were discretionary, but argues that an exception for "malicious, willful and intentional" conduct permits her state law claims to go forward.

I agree with plaintiff.  The Wisconsin Supreme Court has explained that the "malicious, willful and intentional" exception applies to "ill-intended acts" involving "malice, wantonness or intent to injure, rather than negligence."  Bicknese v. Sutula, 2003 WI 31, ¶ 19, 260 Wis. 2d 713, 727, 660 N.W.2d 289, 296 (citation omitted).  There are genuine disputes of material fact regarding whether defendants' conduct was malicious, willful and intentional.

If a jury believed plaintiff's version of events, it could conclude that defendant Heck's use of force against plaintiff was precipitated out of anger, with malice and an intent to injure and that defendant White's failure to intervene to prevent Heck's actions was motivated by the same considerations.

The cases cited by defendants do not require a different result. Defendants cite Sheridan, 164 Wis. 2d 420, 474 N.W.2d 799, but that case is not helpful because the court did not analyze whether the "malicious, willful and intentional" exception applied. Defendants also cite Wilson v. City of Milwaukee, 138 F. Supp. 2d 1126, 1133 (E.D. Wis. 2001), but in that case the court concluded that the "malicious, willful and intentional" exception could not overcome discretionary immunity for a *negligence* claim that would not require a showing of intentional conduct. In this case, however, plaintiff's assault and battery claims will require her to show that defendants acted intentionally. Under her version of events, she has submitted sufficient facts to allow these claims to proceed to trial.

## E. Governmental Liability

Finally, defendants move for summary judgment on plaintiff's claim that the City of Madison is liable for the officers' violation of plaintiff's constitutional rights. To succeed on such a claim, plaintiff must prove that the officers' unconstitutional actions were caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." Thomas v. Cook County Sheriff's Department,

604 F.3d 293, 303 (7th Cir. 2010) (citing <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 690 (1978)).  In this instance, plaintiff argues that the City failed to provide officers adequate training concerning investigation of domestic violence cases, consent to enter residences and use of force.

Plaintiff's claim is governed by a deliberate indifference standard.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); <u>King v. Kramer</u>, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); <u>Jones v. City of Chicago</u>, 787 F.2d 200, 204 (7th Cir. 1986) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.").  Flawed policies or training amounts to deliberate indifference only if "the need for more or different [policies or] training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  <u>City of Canton</u>, 489 U.S. at 388.  Proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence."  <u>Board of County Commissioners of Bryan County v. Brown</u>, 520 U.S. 397, 407 (1997).  The Supreme Court has explained that a plaintiff may make this showing several ways, including: (1) "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights"; and (2) a repeated pattern of constitutional violations makes "the need for further training . . . plainly obvious to the city policymakers." City of Canton, 489 U.S. at 390 and n.10.

Plaintiff has not adduced any evidence of a deficiency in the City's policies or training that could give rise to a claim for deliberate indifference. It is undisputed that defendants White and Heck both received training on use of force, arrest and domestic violence. Plaintiff has identified no deficiencies in this specific training that would support her claim. She suggests that the City condoned defendants' use of force by exonerating Heck. However, Heck's exoneration was based in part on a credibility determination that included plaintiff, Heck and White. Nothing about the investigation itself suggests deliberate indifference.

Finally, plaintiff argues that defendants violated City policy in their interactions with plaintiff. Even assuming this is true, plaintiff's argument supports a finding that the City had relevant policies in place, not that the City's policies were deficient. In short, plaintiff has submitted no evidence from which a reasonable jury could conclude that the City had actual or constructive knowledge that the need for a specific policy or further training was "plainly obvious." City of Canton, 489 U.S. at 390 n. 10; Jenkins v. Bartlett, 487 F.3d 482, 492-93 (7th Cir. 2007). Accordingly, the City of Madison is entitled to summary judgment with respect to plaintiff's Monell claim.

ORDER

IT IS ORDERED that

1.  Plaintiff Briana Rivera's motion for summary judgment, dkt. #28, is DENIED.

2.  The motion for summary judgment filed by defendants City of Madison, Officer Gabriel Heck and Officer David White, dkt. #17, is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED with respect to plaintiff's false arrest claim and her claims against the City of Madison.  The motion is DENIED in all other respects.

Entered this 31st day of January, 2018.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge